AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| LODGED<br>CLERK, U.S. DISTRICT COURT<br>03/02/2021<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ DM _____ DEPUTY | FILED<br>CLERK, U.S. DISTRICT COURT<br>3/2/2021<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: DL DEPUTY |

United States of America

v.

EDWARD KIM,

Defendant(s)

Case No.  2:21-mj-01008

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 15, 2020 in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(b)(1)(B)(viii) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Anthony Clark*
Complainant's signature

Anthony Clark, Special Agent, DOL-OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  03/02/2021

*Judge's signature*

City and state:  Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Andrew M. Roach (x0306)

## AFFIDAVIT

I, Anthony Clark, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a complaint and arrest warrant for Edward Kim ("KIM") for a violation of 21 U.S.C. § 841(b)(1)(B)(viii): Possession with Intent to Distribute Methamphetamine.

2.    This affidavit is also made in support of an application for a warrant to search the following premises (collectively, the "SUBJECT PREMISES"):

        a.    The premises of 1039 South Hobart Boulevard Unit 214, Los Angeles, CA 90006 ("SUBJECT PREMISES 1"), one of KIM's apartments, as more fully described on Attachment A-1;

        b.    The backroom or any other areas under PALOMA FOSTER's control, whether attached or unattached, at the property located at 113 South Grandview Avenue, Covina, CA 91723 ("SUBJECT PREMISES 2"), which is a residence rented by KIM's girlfriend/partner and co-conspirator, PALOMA FOSTER ("FOSTER"), and where KIM is also known to frequent, as more fully described on Attachment A-2;

        c.    The premises of 1301 South Beach Boulevard, Suite E, La Habra, CA 90631 ("SUBJECT PREMISES 3"), a commercial space that KIM is currently renting, as more fully described on Attachment A-3; and

        d.    The premises of 1200 South Figueroa Street, Unit W3124, Los Angeles, CA 90015 ("SUBJECT PREMISES 4"), a luxury

apartment that KIM has been renting since July 2020, as more fully described on Attachment A-4.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code §§ 1028A (Aggravated Identity Theft), 1029 (Fraud in Connection with Access Devices), 371 (Conspiracy), 1956 (Money Laundering), 286 (Conspiracy to Defraud the Government with Respect to Claims), 287 (False, Fictitious or Fraudulent Claims), 1341 (Mail Fraud), 1343 (Wire Fraud), 922(g) (Felon in Possession of a Firearm and Ammunition), and 924(c) (Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime); and Title 21, United States Code, §§ 846 (Conspiracy to Distribute Controlled Substances), 841 (Possession with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communication Facility to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and A-4, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am Special Agent with U.S. Department of Labor Office of Inspector General ("DOL-OIG"), currently assigned to the Las Vegas Field Office.  I have been employed with DOL-OIG since January 2019.  I am a graduate of the Criminal Investigator Training Program and Inspector General Investigator Training Program held at the Federal Law Enforcement Training Center in Glynco, Georgia.  As a DOL-OIG special agent, my duties include investigating fraud, waste, and abuse of various DOL programs.  I have conducted investigations of criminal activity involving unemployment insurance ("UI") fraud, workers' compensation fraud, and grant fraud.  Prior to my employment with DOL-OIG, I was employed as an investigator with the Wage and Hour Division of the U.S. Department of Labor.

## III. SUMMARY OF PROBABLE CAUSE

6.    Since late 2019, multiple federal law enforcement agencies have been investigating Edward Kim ("KIM") for several crimes and fraudulent schemes, including drug trafficking, the filing of false tax returns with stolen identities, and Employment Development Department ("EDD") fraud through the filing of false unemployment insurance claims.

7.    Over the course of the nearly year-and-a-half investigation, agents have determined that, among other things, (1) KIM conspired with others, and carried out, a conspiracy to ship approximately 449 grams of methamphetamine to co-

conspirators in Hawaii in a package addressed from "Edward Kim" to "Clear Point Logistics"; (2) KIM, in conspiracy with another individual, filed approximately 297 fraudulent tax returns using stolen identities in order to fraudulently claim Economic Impact Payments ("EIP"), resulting in a loss of $21,600 dollars; (3) KIM, potentially along with other co-conspirators, fraudulently applied for and received approximately $3.0 million in EDD funds; and mostly recently (4) KIM possessed approximately 22 grams of methamphetamine and other drugs and paraphernalia, including another package of drugs from "Clear Point Logistics," during a traffic stop by the La Habra Police Department ("LHPD").

8.    Throughout this period, law enforcement determined that KIM used multiple locations under his control to facilitate and perpetuate these crimes, including his apartment in Los Angeles (SUBJECT PREMISES 1), the residence of his girlfriend/partner and co-conspirator, PALOMA FOSTER ("FOSTER"), in Covina[1] (SUBJECT PREMISES 2), and a commercial space that KIM rents in La Habra (SUBJECT PREMISES 3), to apply for and receive fraudulent EDD claims and tax filings, and traffic drugs.  Most recently, law enforcement has observed KIM and FOSTER at a luxury apartment in downtown Los Angeles (SUBJECT PREMISES 4), which KIM began renting in July 2020, and for which he has paid portion of with EDD funds.

---

[1] The investigation revealed that KIM and FOSTER are or were in a romantic relationship and share a child.

9.    Finally, on November 15, 2020, the LHPD stopped KIM
for multiple violations of the California Vehicle Code.  This
stop was unrelated to the separate pending federal
investigations into KIM.  During the traffic stop, and after
learning that KIM was on probation with full search terms and
securing his consent, officers searched KIM's car and
belongings.  Among the items found in KIM's car were multiple
pieces of EDD mail in names other than KIM's name, multiple VISA
debit cards in names other than KIM's, approximately 22.049
grams of methamphetamine, other drugs, a digital scale, an
electroshock weapon (commonly referred to as a taser), and
$26,778 in cash.  Law enforcement also found a mail parcel
containing Alprazolam, which was addressed from "Clear Point
Logistics" at P.O. Box 2305, La Habra, California 90632 and
addressed to an individual in Colorado.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.    HSI Investigates KIM for Distribution of
Methamphetamine in November 2019 from SUBJECT
PREMISES 2**

11.    Since October 2019, HSI has been investigating KIM for
distribution of methamphetamine.  That investigation began when
HSI received information from a LHPD source of information
("SOI"), who identified an individual named "Eddie Kim," as a

trafficker of drugs.[2]  Using law enforcement databases, LHPD determined the person identified as "Eddie Kim" was, in fact, KIM.  LHPD then provided a photo of KIM to the SOI, who positively identified KIM as the narcotics trafficker he knows as "Eddie Kim."

12.  Law enforcement then began surveillance on KIM in mid-November 2019.  On November 15, 2019, while conducting surveillance on KIM at SUBJECT PREMISES 2 (which law enforcement later learned was the backroom of a property his partner, FOSTER, rents and resides), LHPD observed KIM exiting SUBJECT PREMISES 2 carrying a shipping box.  LHPD saw KIM get into a car and drive to a FedEx store in West Covina, California.  LHPD observed KIM exit the car carrying the shipping box and enter the FedEx store.

13.  Law enforcement later saw KIM leaving that store with a stack of empty shipping boxes similar in size to the parcel he originally entered the FedEx store with.  After KIM departed, a LHPD detective went inside the FedEx store, identified himself to the FedEx employee, and inquired about the parcel KIM dropped off.  The FedEx employee assisted the LHPD detective in locating the parcel.  The parcel was sealed and labeled from Edward Kim at an address of 3010 Wilshire Boulevard, Los Angeles,

---

[2] The SOI was previously arrested on drug offenses and is working with local law enforcement in the hopes of leniency in prosecution and any potential sentence.  The SOI has the following felony criminal convictions:  possession of a controlled substance in 2007, 2011, and 2013; possession of a controlled substance for sale in 2007, 2008, 2010, 2016, and 2018; transportation of a controlled substance in 2007, 2016, and 2019; making and passing fictitious check in 2016; and possession of a stolen vehicle in 2019.

California 90010 and addressed to "Clear Point Logistics," located at 75-5660 Kopiko Street, Suite C7 #304, Kailua-Kona, Hawaii.

14.   Law enforcement in Hawaii were advised of the package destined to Kailua-Kona, and they obtained an anticipatory search warrant for the parcel from U.S. Magistrate Judge Kenneth Mansfield.  See Case No. 19-MJ-1199 (D. Hawaii).  The search warrant was executed in Hawaii on November 18, 2019.  Inside the package that KIM was seen mailing, law enforcement found approximately 449.6 grams of methamphetamine.  Several co-conspirators in Hawaii were ultimately arrested and charged federally with conspiracy to distribute methamphetamine.

15.   Based on my discussion with other agents, federal agents were planning to charge KIM along with his co-conspirators located in Hawaii.  However, due to the COVID-19 pandemic, federal agents in Hawaii ultimately did not move to arrest or charge KIM in Hawaii due to the travel restrictions and quarantine.  Instead, the case was later referred to the U.S. Attorney's Office in the Central District of California for investigation.

**B.    In June 2020, IRS-CI Begins Investigating KIM for Fraudulent Tax Filings Associated with SUBJECT PREMISES 1 and 2**

16.   Separately, in June 2020, IRS-CI began investigating KIM for filing fraudulent tax returns under stolen identities to receive Economic Impact Payments ("EIP"), also known as stimulus payments.

17.  KIM was first identified as being involved in suspicious tax filings through the EIP Lead Portal.  The EIP Lead Portal is an IRS database developed to combat fraud through identifying suspicious activity associated with non-filer EIP account creation.

18.  After a review of EIP Lead Portal data, IRS-CI identified 297 fraudulent returns filed by KIM and his partner, FOSTER.  The 297 returns were in various names other than the names of KIM and FOSTER.  These returns were linked to five separate banks accounts.  Of the 297 EIP returns, 129 returns listed SUBJECT PREMISES 1 as the taxpayer's address.

19.  IRS-CI then obtained bank records relating to these five bank accounts and determined all the accounts were owned by KIM or FOSTER.  For example, records obtained from Bancorp bank account ending in 6759 showed KIM as the sole account holder. This bank account was associated with 82 returns. Records obtained from Lili bank account ending in 8213 showed KIM as the sole account holder and a total of 89 returns were associated with this bank account.  Records obtained from BBVA USA bank account ending in 2343, Evolve bank account ending in 4718, and Bancorp bank account ending in 4606, showed FOSTER as the sole account holder with the listed address as SUBJECT PREMISES 2. These bank accounts in FOSTER's name were associated with 126 returns.

20.  Further investigation revealed that most of these returns were filed from the IP address of 76.170.55.188.  Law enforcement subsequently obtained subscriber information for the

IP address from Charter Communications.  According to Charter
Communication, KIM was the subscriber of the IP address at the
service address of SUBJECT PREMISES 1 at the dates and times
that the returns were filed.

21.  The IRS-CI interviewed approximately seven individuals
who had tax returns filed under their names which were
associated with KIM or FOSTER.  All of the individuals indicated
the filings were unauthorized and they confirmed they never gave
either KIM or FOSTER permission to use their identities to file
tax returns for EIP payments.

22.  IRS-CI linked KIM and FOSTER to the filing of at least
297 fraudulent tax returns by linking the returns to the bank
accounts associated with KIM and FOSTER or at SUBJECT PREMISES
1.  These tax returns claimed EIP payments totaling
approximately $356,400, of which $21,600 were released and paid
to the bank accounts associated with KIM and FOSTER.

> **C.    In Summer 2020, DOL-OIG Discovers KIM's Scheme to
>         Fraudulently Obtain EDD Benefits Using SUBJECT
>         PREMISES 1-3**

23.  In September 2020, while HSI and IRS-CI were
investigating KIM for drug trafficking and filing false tax
returns, DOL-OIG began investigating KIM for suspected EDD fraud
after receiving the following tip from the Las Vegas
Metropolitan Police Department ("LVMP").

> 1.   <u>KIM is Arrested with EDD Cards in Las Vegas</u>

24.  On September 15, 2020, LVMP arrested KIM after
security at the hotel KIM was staying at observed
methamphetamine and approximately 21 EDD cards inside KIM's

hotel room.  The hotel security observed the items in KIM's room while responding to a disturbance in the room and notified LVMP thereafter.  At time of the incident, KIM was present at the hotel with FOSTER.  FOSTER was not arrested, however.

25.  The 21 EDD cards found in KIM's room were not in KIM's name.  In a search incident to his arrest, LVMP searched KIM's person and found 11 additional EDD cards, for a total of 32 EDD cards, and approximately 17 grams of suspected methamphetamine.  LVMP Mirandized and interviewed KIM.  KIM told LVMP that the reason he had multiple EDD cards in his possession was because he helps people file unemployment claims in exchange for a 10-percent kickback from each of the EDD card owners. LVMP referred the EDD cards to DOL-OIG.

       2.   <u>DOL-OIG Investigates the EDD Cards and Finds that KIM is Connected to Hundreds of Fraudulent Claims</u>

26.  DOL-OIG then began investigating KIM and the EDD cards that were found in his possession during the Las Vegas arrest. DOL-OIG first conducted a search of law enforcement databases and discovered that 22 of the EDD cards in KIM's possession were obtained by filing online applications for unemployment assistance from the IP address of 76.170.62.36 (the "Target IP Address").  Further investigation determined that approximately 400 claims were connected to KIM through the use of the common mailing addresses, IP addresses, or email address, all of which were found to be under KIM's or his co-conspirators' control.

27.  For example, DOL-OIG determined that all 32 EDD cards found in KIM's possession during the Las Vegas arrest listed

locations under KIM's control as the mailing address on the online EDD applications.  Specifically, 18 EDD cards listed SUBJECT PREMISES 1, as the claimant's mailing address on EDD claims, and 1 card listed the home of KIM's parents, as the claimant's mailing address.  In addition, 11 EDD cards listed an apartment at 951 South Beach Boulevard in La Habra, California ("KIM's Former Beach Boulevard Apartment"), which law enforcement determined was KIM's apartment from approximately June 11, 2020 until recently based on lease records.  Two additional cards used the mailing address of 964 East Badillo Street # 436, Covina, CA 91724, which is a private mailbox rented by KIM.[3]

> 3.   DOL-OIG Tracks Hundreds of Additional EDD Claims to KIM at SUBJECT PREMISES 1 through 3

28.  Broadening their investigation, DOL-OIG reviewed additional EDD claims records which showed that at least 78 claims used SUBJECT PREMISES 1 and an additional 170 claims used KIM's Former Beach Boulevard Apartment as their respective mailing addresses on the EDD applications.

29.  DOL-OIG continued its investigation by looking at all other EDD applications filed from the Target IP Address, which was used to file applications for 22 of the 32 EDD cards that were found in KIM's possession in Las Vegas on September 15, 2020.  This analysis showed that at least an additional 114 EDD

---

[3] This address is associated with at least 43 unemployment insurance claims.

claims were filed from the Target IP Address between May 2020 and July 2020.

30.   DOL-OIG subpoenaed subscriber information for the Target IP Address from Charter Communications.  Charter reported that KIM was the subscriber of the Target IP Address, with a service address of SUBJECT PREMISES 1, at the time the fraudulent EDD claims were filed.

31.   DOL-OIG reviewed additional EDD claims records, which showed at least four other claims, including FOSTER's own EDD claim, used SUBJECT PREMISES 2 as their respective mailing address on the EDD applications.  Additionally, law enforcement determined that FOSTER was the subscriber of IP address 76.91.184.115, which was used to file at least 80 claims, including four of the EDD cards in KIM's possession during the Las Vegas arrest.

32.   Further analysis of EDD claims records showed at least 17 claims used SUBJECT PREMISES 3 as their respective mailing address on the EDD applications.

        4.   <u>DOL-OIG Determines That Many of the Fraudulent EDD Claims are in Inmates' Names</u>

33.   DOL-OIG also determined that 23 of the 32 EDD cards in KIM's possession during the Las Vegas arrest were in names of incarcerated California Department of Corrections and Rehabilitation ("CDCR") inmates.  Inmates are not eligible to apply for unemployment insurance ("UI") benefits because they are not unemployed through no fault of their own; able and available for work; and/or actively seeking work.  The EDD

applications for these 23 inmate-claims each reported being
unemployed as a direct result of COVID-19 and an annual income
of $72,000.  This reported income on the fraudulent applications
caused EDD to pay the maximum amount, thereby maximizing the
fraud and benefits received.  None of these applications
provided driver's license information either, which is requested
on the applications for verification purposes.

34.  The table below provides a sample of the EDD inmate-
claims that were tracked to KIM.  Notably, each of the claims
share commonalities, including unemployment reason, reported
income, affected work date, and lack of driver's license for
verification.  Each of the claims also used an address
controlled by KIM, including SUBJECT PREMISES 1, KIM's Former
Beach Boulevard Apartment, and KIM's private mailbox.

| State Claim Filed | Reason Unemployed | Claimant | Provided Driver's License | Stated Income | Date Work Affected | Date Claim Filed | Amount of Claim and Status | Incareation Dates in CA |
|---|---|---|---|---|---|---|---|---|
| CA | COVID-19 | M.B. | N | $72,000.00 | 2/2/2020 | 5/16/2020 | Approved $23,100 | 1/23/2017 to Present |
| CA | COVID-19 | W.B. | N | $72,000.00 | 2/2/2020 | 5/30/2020 | Approved $22,800 | 12/28/2017 to Present |
| CA | COVID-19 | Y.B. | N | $72,000.00 | 2/2/2020 | 6/4/2020 | Approved $18,300 | 5/3/2016 to Present |
| CA | COVID-19 | E.C. | N | $72,000.00 | 2/5/2020 | 7/4/2020 | Approved $21,450 | 2/8/2019 to Present |
| CA | COVID-19 | B.D. | N | $72,000.00 | 2/12/2020 | 7/4/2020 | Approved $21,450 | 1/28/2010 to Present |
| CA | COVID-19 | J.G. | N | $72,000.00 | 2/2/2020 | 7/4/2020 | Approved $22,800 | 12/16/2019 to Present |
| CA | COVID-19 | I.H. | N | $72,000.00 | 2/4/2020 | 7/4/2020 | Approved $22,800 | 11/19/2015 to Present |
| CA | COVID-19 | E.I. | N | $72,000.00 | 2/3/2020 | 7/9/2020 | Approved $22,800 | 3/16/2010 to Present |
| CA | COVID-19 | A.K. | N | $72,000.00 | 2/2/2020 | 7/25/2020 | Approved $22,800 | 9/10/2010 to Present |
| CA | COVID-19 | B.K. | N | $72,000.00 | 2/2/2020 | 7/25/2020 | Approved $21,900 | 10/13/2011 to Present |

35.  DOL-OIG further investigated each of these inmate-
claims through a review of EDD records, CDCR records, and

discussions with CDCR representatives.  Below are examples of
some of the findings:

       a.    Inmate-Claimant I.H.:  An EDD claim in I.H.'s
name and using I.H.'s social security number was filed on July
4, 2020.  EDD claim records indicate that I.H.'s claim for EDD
benefits reported that he lost work due to COVID-19 and earned
an annual salary of $72,000 before his loss of employment.  His
reported last day of work was June 27, 2020; however, CDCR
records indicate that I.H. has been incarcerated since November
19, 2015.  Further investigation revealed that the Target IP
address, registered to SUBJECT PREMISES 1, was used to file the
claim.  Kim's Former Beach Boulevard Apartment was listed as
I.H.'s mailing address on the application.  Bank of America
("BofA") records indicate that an EDD debit card issued in the
name of I.H., ending 9474, was mailed to Kim's Former Beach
Boulevard Apartment on July 10, 2020.  BofA records indicate
that I.H.'s card was used multiple times from July 19, 2020 to
September 13, 2020, including 9 purchases totaling $2,300.86 and
20 ATM withdrawals totaling $20,003.  Surveillance footage
associated with the ATM withdrawals show a person matching KIM's
description, as well as currently unknown associates, making
multiple withdrawals using the card in I.H.'s name.

       b.    Inmate-Claimant W.B.:  An EDD claim in W.B.'s
name and using W.B.'s social security number was filed on May
30, 2020.  EDD claim records indicate that W.B.'s claim for EDD
benefits reported that he lost work due to COVID-19 and earned
an annual salary of $72,000 before his loss of employment.  His

reported last day of work was May 23, 2020; however, CDCR records indicate that W.B. has been incarcerated since December 28, 2017.  Further investigation revealed that the Target IP address, registered to SUBJECT PREMISES 1, was used to file the claim.  SUBJECT PREMISES 1 was also listed as W.B.'s mailing address on the application.  BofA records indicate that an EDD debit card issued in the name of W.B. was mailed to SUBJECT PREMISES 1 on June 5, 2020.[4]

        c.    <u>Inmate-Claimant E.I.</u>:  An EDD claim in E.I.'s name and using E.I.'s social security number was filed on July 9, 2020.  Similar to the other claims, EDD claim records indicate that E.I.'s claim for EDD benefits reported that he lost work due to COVID-19 and earned an annual salary of $72,000 prior his loss of employment.  His reported last day of work was July 4, 2020; however, CDCR records indicate that E.I. has been incarcerated since March 16, 2010.  EDD records indicate that IP address 172.118.206.165 was used to file the claim.[5]  Further investigation revealed that E.I.'s application listed KIM's Former Beach Boulevard Apartment as the mailing address.  BofA records indicate that a debit card, ending in 4746, was issued in E.I.'s name and mailed to KIM's Former Beach Boulevard

---

[4] KIM had this card in his possession when LVMPD arrested him on September 15, 2020, and it was subsequently seized. Following its seizure, BofA records indicate another card was issued to W.B. and mailed to SUBJECT PREMISES 1 on September 21, 2020.  This second card was found in KIM's possession during the November 15, 2020 arrest in La Habra, California.

[5] This IP address was also used in at least 56 EDD claims, 54 of which used KIM's Former Beach Boulevard Apartment as the mailing address.

Apartment on July 13, 2020.  Later, BofA surveillance shows a man matching KIM's description making a $1,000 withdrawal from a BofA ATM located near Beach Boulevard and La Habra Boulevard in La Habra, California on August 27, 2020.

36.  Further review of additional Bank of America surveillance shows a suspect matching KIM making numerous $1,000 withdrawals using EDD cards in names other than his own.  Many of these withdraws occurred at ATMs near SUBJECT PREMISES 1.

> 5.  <u>DOL-OIG Determines that KIM is Responsible for over $3.0 Million Fraudulent EDD Payments and That He and Others Withdrew At Least $1.9 Million in Cash</u>

37.  All told, DOL-OIG agents determined that KIM has filed or caused the filing of at least 400 fraudulent EDD claims, with at least 120 of these fraudulent claims filed in the name of inmates at California correctional institutions.  Ultimately, DOL-OIG determined that EDD paid out at least $3.0 million on the approximately 400 EDD claims associated with KIM from approximately March 30, 2020 to September 8, 2020.

38.  A significant portion of EDD benefits that were paid, at least $1.9 million, were withdrawn in cash ATM withdrawals by KIM and unknown co-conspirators.  As a result, law enforcement believes that KIM still possesses a significant amount of cash at any one or multiple SUBJECT PREMISES.  Indeed, in this regard, law enforcement learned that, in late September 2020, KIM made multiple large cash purchases, including a brand new,

2020 model year Dodge Ram Rebel truck, which KIM purchased with
approximately $81,500 in cash.[6]

> **D.    LHPD Stops KIM in November 2020 and Finds
> Methamphetamine and Drugs in a "Clear Point Logistics"
> Parcel**

39.    Most recently, KIM was arrested by local police and
found to be in possession of methamphetamine, additional EDD
materials, and a package of drugs from "Clear Point Logistics."

40.    Specifically, at approximately 12:55 a.m. on November
15, 2020, LHPD pulled over KIM, who was driving alone in his new
Dodge Ram Rebel truck, for multiple violations of the California
Vehicle Code.  Before the stop, LHPD first saw KIM's truck
depart the business complex where SUBJECT PREMISES 3 is located.
Upon exiting the complex, an officer saw the truck enter an
intersection, then it suddenly braked and stopped.  The truck
then reversed back into the business complex where SUBJECT
PREMISE 3 was located, in violation of California Vehicle Code
Section 22106.  The officer then saw the truck wait for
approximately 45 seconds behind the limit line with its turning
signal activated.  The officer then saw that the truck had
heavily tinted windows and lacked a front license plate, both
violations of the California Vehicle Code.  As the officer
passed the truck, the truck then made an immediate right turn,
opposite its original direction of travel, and sped off.  The
officer made a U-turn and visually observed the truck going
approximately 80 miles per hour, in violation of the 50 mile per

---

[6] Notably, during the relevant time period, KIM had no
reported wage income, according to EDD.

hour speed limit.  The officer then conducted a traffic stop of the truck.

41.  After pulling over the truck, LHPD ran a records check on KIM, which showed that KIM was on formal probation through Los Angeles County with full search and seizure terms, including his person and any vehicles under his control.  The truck came back registered to KIM at SUBJECT PREMISES 4.

42.  KIM told officers that he was driving home from work, which he identified as a business that he owned.  Officers later found a utility bill for SUBJECT PREMISES 3 in the truck.  LHPD then asked KIM what he was on probation for.  KIM responded "sales."[7]  When they asked what he was selling, KIM responded "drugs."  The officers then asked, "what kind of drugs?"  KIM responded, "meth."[8]

43.  Pursuant to the terms of KIM's probation, LHPD asked KIM to exit the truck.  LHPD then conducted a search of his person.  During the search, LHPD discovered a large quantity of cash in KIM's back pocket, which KIM identified as $10,000 cash

_____

[7] The quotes are not verbatim as no transcript from the stop exists at this time.  Rather, the quotations reflect what KIM said in substance based on the officer's body-worn camera footage.

[8] A subsequent review of KIM's criminal history reveals that he has several convictions, including, among others, a conviction for manufacturing a controlled substance in 2014; possession of a controlled substance in 2014; misdemeanor burglary in 2014; bringing a controlled substance into prison in 2015; possession of a controlled substances in 2016; possession of a controlled substances in 2017; possession of 10 or more IDs with intent to defraud in 2019; and possession of a controlled substance for sale in 2019.

in $100 bills.  KIM said the money was for his rent, which he said was approximately $6,000 per month.

44.  Officers then asked if there was any methamphetamine in the car.  KIM responded no.  Officers then asked KIM if they could search the truck.  KIM consented and asked them to make it quick.

45.  Officers then searched the truck pursuant to both KIM's search terms and his consent.  Upon immediately opening the passenger door, and within seconds of starting the search, officers saw suspected methamphetamine residue and a suspected rock of methamphetamine in the truck's passenger side door panel.  Officers explained to KIM what they had found in this car.  Upon hearing they found methamphetamine, KIM said, "I don't have any."  In response, an officer stated that she "could see it in the side of his car."  KIM responded, "what do you mean?"  At that point, the officer took the suspected methamphetamine rock from the car and walked it over to show KIM directly.  The officer even shined her flashlight on it.  KIM continued to appear to play coy, and said, "what is that?"  KIM claimed he "had no idea" what it was and asked the officer "are you sure?" when she told him it was methamphetamine.

46.  Officers then continued the search of KIM's truck.  During the search, officers located a black bag on the front seat containing a digital scale covered in suspected methamphetamine residue, a glass jar of marijuana, a computer hard drive, and a black container labeled as "moonrocks."  The officer asked KIM what "moonrocks" were.  KIM responded that

they were a type of marijuana, indicating that he knew about the contents of the bag and had control over the items inside, including the digital scale.  Inside the car, officers also found a fluorescent grow light still inside its original packaging and other items related to the cultivation of marijuana.  KIM told officers he was growing marijuana for personal consumption.

47.  In the front seat of the vehicle, LHPD located a sealed mail parcel, which was labeled from "Clear Point Logistics," P.O. Box 2305, La Habra, California 90632 and addressed to an individual in Colorado.[9]  LHPD asked KIM if that parcel belonged to him.  KIM only answered that it was outgoing mail.  Based on the fact that KIM had possession of this parcel in the truck, knew of the outgoing status of the parcel, and was on probation with search terms, LHPD opened the parcel.  Within the parcel, officers found white rectangular pills believed to be Alprazolam (also known as Xanax).

48.  In the truck's backseat, LHPD found an orange backpack which contained an electroshock weapon (commonly referred to as a taser) and a white pill bottle with KIM's name in the front zippered compartment along with bills in KIM's name.  The larger compartment of the backpack was locked closed with a combination lock.  LHPD asked KIM for the combination to the lock on the backpack.  KIM stated the backpack did not belong to him and that it belonged to his girlfriend.  Based on the fact that KIM

_____

[9] Clear Point Logistics was the company on the package containing methamphetamine that KIM was seen mailing to Hawaii in November 2019, as discussed above.

was on probation and subject to search terms, the truck was
registered to KIM (who was the sole occupant), and KIM's
property (including his prescription medication and bills) was
found inside the backpack, officers forced entry into the
backpack with a knife.

49.  Within the locked compartment, LHPD located several
pieces of EDD mail, bills, booking information from a prior
arrest of KIM, two cell phones, several Visa cards in various
individuals' names other than KIM's, two clear plastic baggies,
and a black container containing what later tested positive for
approximately 22.049 grams of methamphetamine.  Notably, many of
EDD cards and EDD mailings found in the truck were addressed to
various individuals at SUBJECT PREMISES 1.  Officers also
located a yellow pill bottle labeled with a female's name.
Inside that bottle, LHPD located three different types of pills,
one of which was suspected to be Alprazolam.

50.  During the search of the truck, officers also found an
additional stack of cash, similar to the stack of cash found on
KIM, as well as a third stack of cash in some bags.  All told,
officers seized approximately $26,778 in cash from KIM's person
and the truck.

51.  Officers arrested KIM for the possession of the drugs
and seized his digital devices, contraband, cash, bags, debit
cards, EDD materials, and other items as evidence.  The truck
was impounded as evidence.

52.  On December 14, 2020, Magistrate Judge
Gail J. Standish issued a federal search warrant for KIM's truck

and the four digital devices found inside.  Law enforcement then
executed a search of the truck.  During the search, officers
found a Spectrum Business mailing addressed to "Clear Point
Logistics" at SUBJECT PREMISES 3, causing them to believe that
Clear Point Logistics is operating from that location.  Officers
also found the truck's DMV registration, which listed KIM as the
registered owner at SUBJECT PREMISES 4, a Colorado state ID with
KIM's name and image, and mailing address to KIM at KIM's Former
Beach Boulevard apartment, and 3010 Wilshire Boulevard, Los
Angeles, California, among others.

53.  In addition, officers found a notebook inside KIM's
truck.  Inside the notebook, officers found, among other items,
a bill of sale for an Aprilia motorcycle for $9,500 cash on
September 4, 2020 as well as documents referencing KIM's
purchase of a Harley Davidson motorcycle in cash on or around
September 8, 2020.  The notebook also contained a handwritten
ledger of expenses, including expenses for "Ram Truck $60K,"
"Ducati 1199 $15K," and "Aprilia RSV4 $15k," which appear to be
references to KIM's truck and motorcycles.  The handwritten
ledger also includes cash notations, including "$80K cash,"
"$90k cash, "$290K cash," and "$120K cash Mom."

54.  A search of the digital devices found in KIM's truck
revealed, among other items, numerous images of large quantities
of suspected methamphetamine, significant quantities of cash,
miscellaneous pills, a pill press, and a gun.  There were also
images of notes that referenced a pill press and bitcoin.  The
digital devices also included indicia of KIM's ownership,

including pictures of his driver license, photos of himself
(including KIM holding cash), references to Clear Point
Logistics, and receipts for Clear Point Logistics shipments to
Hawaii in November 2019.

55.  In addition, the digital devices contained a
screenshot of a conversation between a person believed to be KIM
and an individual named Peter.  KIM appears to say "I need to
know ASAP it's very important.  I got 50K on the line here bro."
Peter responds, "Yo eddie I just told you how I feel after
taking a qtr of it . . . I just snorted half of one so I told
you I'll let you know here soon if I feel anything."  Based on
my training and experience and conversations with other law
enforcement officers, I believe this conversation is in
reference to the production and distribution of illicit drugs.

### E.   Law Enforcement's Investigation and Continued Surveillance of KIM Shows He Operates Out of All SUBJECT PREMISES and Has Connections to Each

56.  During the investigation, law enforcement has
identified KIM's multiple contacts at each of the SUBJECT
PREMISES.  As a result of these pending investigations, law
enforcement believes the SUBJECT PREMISES contain evidence
related to these investigations, including, but not limited to,
drug trafficking and EIP and EDD fraud.  Law enforcement also
believes these SUBJECT PREMISES likely contain large amounts of
cash from the approximately $3.0 million in fraudulent EDD funds
that KIM received.

1.   SUBJECT PREMISES 1 – KIM's Apartment

57.  Based on records provided from the landlord, law
enforcement determined that KIM is the current lessee of SUBJECT
PREMISES 1, an apartment in Los Angeles, since April 2020
through the present.  Moreover, law enforcement determined that
rent payments for SUBJECT PREMISES 1 were paid from KIM's
Bancorp 6759 account and EDD cards in the names of two CDCR
inmates, including one found in KIM's possession during his Las
Vegas arrest.  Each EDD card used SUBJECT PREMISES 1 as a
mailing address.

58.  Around the fall 2020, the owner of SUBJECT PREMISES 1
reported to law enforcement that an unknown white male was
staying at SUBJECT PREMISES 1.  The owner reported that the
unidentified white male was creating disturbances at SUBJECT
PREMISES 1, including climbing down apartment balconies and,
more recently, stealing artwork and packages from the common
areas.  The owner observed the white male on numerous occasions
waiting for the mail man, who handed mail directly to him
instead of putting them in the mailboxes located in the lobby.
The owner reported seeing on one occasion about 50 EDD letters
all addressed to different individuals and the postal carrier
could not fit them all into the mailbox for SUBJECT PREMISES 1.
When the owner asked the white male who he was, the white male
told the owner that he is an associate of KIM's and that he is
taking care of things for KIM at SUBJECT PREMISES 1.  When the
owner asked the white male to sign a lease for the unit, the
white male stated that he does not live there and is just taking

24

care of business for KIM while KIM is in Denver.  The owner stated he called KIM approximately a month ago to ask for overdue rent payment, and KIM stated during the call that he is having issues with his account and will be sending payment soon.

59.  Law enforcement reviewed surveillance from SUBJECT PREMISES 1 containing the unidentified white male.  Law enforcement subsequently determined that the unidentified white male seen at SUBJECT PREMISES 1 matched the description of a co-conspirator who was seen on BofA surveillance withdrawing money from fraudulently-issued EDD cards.  For example, BofA surveillance shows the unidentified white male seen at SUBJECT PREMISES 1, and an unidentified Asian female recently seen entering SUBJECT PREMISES 1 on February 5, 2021, have also made multiple ATM withdrawals from EDD cards that were found in KIM's possession during his Las Vegas arrest.  BofA surveillance shows the unidentified white male making withdrawals on at least a dozen occasions from various cards found in KIM's possession during his Law Vegas arrest.  For instance, on August 16, 2020, the unidentified white male withdrew $1,000 from an EDD card in the name of CDCR inmate I.H.  Based on Google Maps, this BofA ATM is approximately 0.3 miles from SUBJECT PREMISES 1.[10]

60.  Additionally, on July 22, 2020, the unidentified Asian female recently seen entering SUBJECT PREMISES 1 withdrew $1,000

---

[10] As discussed below, I know it is common for EDD fraudsters to send EDD correspondence to addresses under their control, rather than where they actually live.  This allows the fraudster to access the mail while putting one layer of separation between themselves and the mailings in order to evade detection by law enforcement.

from three EDD cards at a BofA ATM located near Western Avenue and Olympic Boulevard in Los Angeles.  Again, each of the cards used for those withdrawals were found in KIM's possession during his Las Vegas arrest, including one in the name of CDCR inmate E.I.

61.  Most recently, law enforcement has observed one of KIM's cars in the vicinity of SUBJECT PREMISES 1.  Specifically, in January 2021, LHPD received a GPS warrant for one of KIM's cars from Orange County Superior Court Judge Nancy Zeltzer.[11] This GPS tracker shows pings from KIM's car within the vicinity of SUBJECT PREMISES 1 on several occasions, with one ping as recently as February 4, 2021, which was within 10 to 15 meters of SUBJECT PREMISES 1.

62.  Recent postal records show that, on February 9, 2021, KIM placed a mail hold for all mail delivered to SUBJECT PREMISES 1.  The mail hold began on February 9, 2021 with an end date of March 11, 2021.  The instructions on the hold state "Please do not deliver to mailbox and only release to the authorized tenant on the leasing agreement, Mr. Edward Kim."

63.  Further review of EDD records shows that additional EDD mailings were mailed to SUBJECT PREMISES 1 as recently as January 2021.

64.  All told, law enforcement connected SUBJECT PREMISES 1 to approximately 78 fraudulent EDD applications and 129 fraudulent tax returns.

---

[11] KIM has additional cars and motorcycles which were not tracked.  Thus, law enforcement is only aware of the movements of one of KIM's vehicles.

2.   <u>SUBJECT PREMISES 2 – FOSTER's Residence</u>

65.   SUBJECT PREMISES 2 is the backroom or any other areas under PALOMA FOSTER's control, whether attached or unattached, at the single-family residence located at 113 South Grandview Avenue, Covina, CA 91723.  During the investigation, law enforcement spoke with the owner of the property who told law enforcement that he rents a "backroom" to FOSTER.  During the investigation, law enforcement and other witnesses have identified KIM and FOSTER as being present at SUBJECT PREMISES 2 throughout the relevant periods.  A review of the CLEAR database also shows that FOSTER and KIM are associated with SUBJECT PREMISES 2.

66.   Most recently, law enforcement observed FOSTER at SUBJECT PREMISES 2 on February 13, 2021.  Further review shows that FOSTER is still using SUBJECT PREMISES 2.  For example, she recently renewed her driver's license and listed SUBJECT PREMISES 2 in the renewal application, dated February 3, 2021.  In addition, FOSTER recently confirmed SUBJECT PREMISES 2 as her mailing address on her own individual EDD application, which she updated on February 15, 2021.

67.   As a result, law enforcement believes that FOSTER and KIM still occasionally reside at and have access to SUBJECT PREMISES 2.

68.   All told, law enforcement connected SUBJECT PREMISES 2 to approximately four fraudulent EDD applications and three bank accounts registered in FOSTER's name at this address were linked to dozens of fraudulent tax return filings.

27

3.    SUBJECT PREMISES 3 – KIM's Corporate Suite

69.   SUBJECT PREMISES 3 is a corporate suite that KIM is currently renting in the name of "Clear Point Logistics."  Law enforcement believes it may be associated with KIM's drug trafficking activities.

70.   Law enforcement has surveilled SUBJECT PREMISES 3 on multiple occasions.  During this surveillance, the corporate suite appears vacant.  It has no visible signage and no name on the door or elsewhere, as depicted in the picture below.  It does not appear open to the public.  Law enforcement, however, observed KIM's cars at SUBJECT PREMISES 3 on multiple occasions.



71.   Law enforcement subsequently conducted additional investigation into Clear Point Logistics.  That investigation revealed that Clear Point Logistics is a California-registered Limited Liability Company.  According to the Secretary of State, the business was registered on June 17, 2020.  The entity's mailing address is listed as KIM's Former Beach Boulevard Apartment.  Legalzoom.com is the listed agent for service of

process for Clear Point Logistics.[12]  Further investigation determined that Clear Point Logistics is not registered to do business in the City of La Habra.  The City of La Habra has no records of any business or person at SUBJECT PREMISES 3, and it considered the unit to be vacant.

72.  Law enforcement obtained the landlord of the building housing SUBJECT PREMISES 3.  The records revealed that that, on July 14, 2020, KIM, acting as a guarantor, entered into a one-year lease for SUBJECT PREMISES 3 on behalf of Clear Point Logistics.  The lease term runs from August 1, 2020 to July 31, 2021.  Leasing records for SUBJECT PREMISES 3 also list KIM as a representative of Clear Point Logistics with a contact address as SUBJECT PREMISES 1.

73.  Most recently, law enforcement has repeatedly seen KIM's cars at SUBJECT PREMISES 3, including as recently as February 25, 2021.  Law enforcement has also observed KIM's father at SUBJECT PREMISES 3.

74.  Based on the investigation as a whole, and the evidence set forth above, law enforcement believes that KIM and any co-conspirators are not engaged in legitimate business activity and that SUBJECT PREMISES 3 and Clear Point Logistics are permeated by fraud.  Among other things, this is because the business entity was only recently created; the business entity was created using the services of Legalzoom.com, which was paid

---

[12] One of the EDD card associated with KIM had multiple Legalzoom.com charges, including a registered agent fee, from between June and July 2020, the time when Clear Point Logistics was organized.

for with fraudulently obtained EDD funds; the business entity is not registered to do business in the City of La Habra; the City of La Habra has no record of any business or person currently at SUBJECT PREMISES 3; SUBJECT PREMISES 3 appears vacant from the outside; SUBJECT PREMISES 3 has no visible signage or name on the exterior; SUBJECT PREMISES 3 shows no signs of any legitimate business activity; SUBJECT PREMISES 3 was used as a mailing address for 17 EDD claims, including at least 7 identified as from inmates; and, finally, KIM appears to be using the name Clear Point Logistics to ship drugs around the country, including methamphetamine to Hawaii and Alprazolam to Colorado.

        4.   <u>SUBJECT PREMISES 4 – KIM's New Luxury Apartment</u>

    75.  Lastly, law enforcement involved in the investigation believes that SUBJECT PREMISES 4 is KIM's new downtown luxury apartment.  Leasing documents indicate KIM began leasing SUBJECT PREMISES 4 on July 25, 2020.  Moreover, law enforcement believes that KIM is using money received from EDD to pay for this apartment.  Specifically, BofA records indicate that a fraudulently-obtained EDD card associated with KIM was used to pay for fees related to the rental application of SUBJECT PREMISES 2.[13]  In addition, KIM listed SUBJECT PREMISES 4 as the address on the sale documents for the Dodge truck he purchased on September 28, 2020.

---

[13] The application for this EDD card was filed from the Target IP Address with a mailing address of KIM's Former Beach Boulevard Apartment.

76.   Law enforcement believes that KIM is residing at
SUBJECT PREMISES 4 and FOSTER is known to frequent the residence
as well.  Specifically, in mid-January 2021, law enforcement
observed KIM's motorcycle and FOSTER's car present at SUBJECT
PREMISES 4.  In addition, the landlord of SUBJECT PREMISES 4
provided law enforcement with recent surveillance showing KIM at
SUBJECT PREMISES 4.

## V.   BACKGROUND INFORMATION ON UNEMPLOYMENT INSURANCE BENEFITS AND COIVD-19 RELATED FRAUD

77.   Since 1935, the U.S. Department of Labor's
Unemployment Insurance ("UI") program has provided unemployment
benefits to eligible workers who become unemployed through no
fault of their own.  This program ensures that at least a
significant portion of the necessities of life--most notably
food, shelter, and clothing--are met on a weekly basis while the
worker seeks employment.  UI beneficiaries who meet the
requirements of the applicable state law are eligible for this
temporary financial assistance.  Each state administers a
separate UI program within the guidelines established by Federal
law.  In California, the EDD administers the UI program for
residents and others physically performing work activities in
California.

78.   Generally speaking, regular UI claimants must be:
(1) unemployed through no fault of their own; (2) able and
available for work; (3) willing to accept suitable work; and (4)
actively seeking work.

79.   On March 13, 2020, the President of the United States declared the COVID-19 pandemic an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.   On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted to provide emergency assistance and health care response for individuals, families, and businesses affected by the COVID-19 pandemic.   The CARES Act included, among others, the establishment of (1) the Pandemic Unemployment Assistance ("PUA") benefit to provide financial assistance to individuals who are out of work due to the pandemic, including those who do not usually qualify for regular state UI such as self-employed, contract, and "gig workers," (2) the Pandemic Emergency Unemployment Compensation ("PEUC") benefit, a 13-week benefit extension for people who have used all benefits available in their regular UI claim, and (3) the Pandemic Additional Compensation ("PAC") benefit, an additional $600 federal stimulus payment automatically added to each week of benefits received between March 29, 2020 and July 25, 2020.

80.   Prior to the enactment of the CARES Act, to be eligible for UI administered by California's EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim.   Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

81.  Under the PUA program, workers who are not eligible for regular UI benefits but are unemployed or partially unemployed for a COVID-19-related reason permissible under federal law may receive unemployment benefits for up to 46 weeks.  Under the PEUC program, workers who are eligible for the regular UI benefits for up to 26 weeks may receive an additional 13 weeks of benefits for a total of 39 weeks.  Under the PAC program, an individual receiving a regular UI benefit, a PUA benefit, or a PEUC benefit between March 29, 2020 and July 25, 2020, the EDD pays an additional $600 in CARES Act funds to each week of benefits.

82.  California EDD began accepting applications for PUA benefits on or about April 28, 2020.  To make benefits available as quickly as possible, payments are issued in phases.  If a claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

a.  Phase 1: For claims with start dates from February 2, 2020 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

b.  Phase 2: For claims with start dates from March 29, 2020 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.

c.  Phase 3: For claims with start dates from July 26, 2020 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

83.   PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

84.   A UI claimant can usually collect 26 weeks of regular state UI benefits.  As noted above, the CARES Act allows for additional PEUC benefit to provide up to 13 weeks of additional payments, for a total of 39 weeks of benefits.  PEUC is available to persons who were or are fully or partially unemployed at any time between from March 29, 2020 through December 26, 2020.  Persons with a regular UI claim, a PUA claim, or a PEUC extension filed between March 29, 2020 and July 25, 2020, also receive Federal Pandemic Unemployment Compensation ("FPUC"), which is the extra $600 per week. Between July 25, 2020 and September 5, 2020, the FPUC benefit amount was an extra $300 per week, instead of an extra $600 per week.

85.   Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  EDD may request documentation to provide proof of the stated income.[14] If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using

---

[14] In general, EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

other resources available to EDD in order to increase the PUA
weekly benefit amount.

86.  Like regular UI claims, PUA claims can be filed
online.  When an individual files a PUA claim online, EDD
automatically maintains certain information regarding the filing
of the claim.  This information includes the date and time the
claim was submitted, the name of the person for whom the claim
was filed, and the Internet Protocol ("IP") address of the
computer, or Internet Service Provider ("ISP") account, that was
used to file the claim.

87.  A PUA claimant must answer various questions to
establish his or her eligibility for PUA benefits.  The claimant
must provide his or her name, social security number, and
mailing address.  The claimant must also identify a qualifying
occupational status and COVID-19-related reason for being out of
work.

88.  After it accepts a UI claim, including a claim
submitted pursuant to the PUA program, EDD typically deposits UI
funds every two weeks to a BofA-administered Electronic Benefit
Payment ("EBP") debit card, which the claimant can use to pay
for his/her expenses.  This EBP card is sent via the U.S. Postal
Service to the claimant at the address the claimant provides in
their UI claim.  Claimants can activate their debit card over
the phone or online.

89.  When receiving regular UI benefits, a claimant must
complete a Continued Claim Form (DE 4581) and certify every two
weeks, under penalty of perjury, that he/she remains unemployed

35

and eligible to receive UI benefits.  EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.[15]

90.  The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of EBP debit cards administered by BofA that are used to access the fraudulently obtained UI benefits.  The co-schemers and their associates use the EBP debit cards to withdraw the fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines and point of sale (POS) purchases at merchants across the United States.

91.  Based on my conversations with other law enforcement officers, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, among other indicia:

a.  Co-schemers commonly buy or outright steal the personally identifiable information ("PII") of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds.  Co-schemers often buy PII from

---

[15] The combination of regular UI, PUA, and/or FPUC claims are henceforth collectively referred to as "UI claims." Similarly, the combination of regular UI, PUA, and/or FPUC benefits are henceforth collectively referred to as "UI benefits."

other fraudsters or from the Dark Web[16] (using cryptocurrency such as Bitcoin) and verify that the PII belongs to real persons by checking the PII at background check websites such as Beenverified, Spokeo, Intelius, and Whitepages.

b.    Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  In this regard, fraudsters sometimes typically do not use their actual residences, but rather other addresses they control, in order to evade detection.  Once the EBP debit cards arrive, co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

c.    Submitting multiple UI claims from the same IP address for multiple claimants.  These claims are sometimes submitted on the same day close in time.

d.    Providing the same phone number or no phone number for multiple UI claims for different claimants.  The phone number is usually one the schemers control.

e.    Submitting multiple UI claims without providing a driver's license number or state identification number.

---

[16] Dark Web is the set of web pages on the Internet that cannot be indexed by search engines, are not viewable in a standard web browser, require specific means (such as specialized software or network configuration) in order to access, and use encryption to provide anonymity and privacy for users.  Dark Web has become the Internet's black market in recent years where visitors can make illegal purchases of PII, guns, and drugs, and trade child pornography.

## VI. <u>TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES</u>

92. Based on my training, education, and experience, and discussions with other law enforcement personnel, along with information provided by sources of information and confidential sources, I know the following:

a. UI fraudsters often keep large amounts of United States currency on hand. Fraudsters commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for fraudsters to possess proceeds and items purchased with proceeds in their homes and vehicles. Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of UI defrauders.

b. UI fraudsters often maintain UI debit cards and mailing distributed by state workforce agencies ("SWA") in order to continue to receive the funds and utilize them through ATM transactions or point of sale purchases. Fraudsters commonly maintain such items in homes, businesses, or in their vehicles.

c. UI fraudsters often maintain paper records of their fraudulent UI activity. Such records are commonly maintained for long periods of time and therefore are likely to be found at the SUBJECT PREMISES.

d. UI fraudsters commonly use computers, cellular telephones, and other electronic devices to communicate with other fraudsters about their defrauding activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet and applications based communication

forums to obtain and distribute personal identifying information.  The fraudsters also utilize these devices to apply for the UI benefits and to transfer and/receive the benefits. Therefore, evidence related to UI defrauding is likely to be found on electronic storage media found at the SUBJECT PREMISES, as further described below.

e.   In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, I also request permission to seize any articles tending to establish the identity of persons who have dominion and control over the SUBJECT PREMISES, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

93.  Based on my training and experience, conversations with other law enforcement officers, and familiarity with investigations into fraud and money laundering involving false tax returns (including government stimulus payments), I know that individuals scheming to fraudulently obtain economic assistance payments generally follow recognizable patterns, including the following, among others:

a.   Filing fraudulent tax returns in other persons' names to collect government funds.  In some instances, the tax returns are from victims of identity theft; in other instances, the tax returns or claims are from people who have provided their personal identifying information to the schemers and have agreed to pay the schemers a portion of the fraudulent benefits

that are obtained from the tax returns; in yet other instances, the tax returns or claims are from people who believe they may be entitled to benefits but do not know that the schemers are reporting false information to the IRS to fraudulently increase the amount of the benefits claimed and or received.

b.   Using computer, cellphones, and other digital devices, the schemers submit false tax returns to the IRS and using a static IP address associated to a residential or commercially available internet service provider.

c.   Using banks accounts controlled by the schemers, the schemers then list bank account numbers they control on the false tax returns.

d.   Using mailing and physical addresses that the schemers control, the schemers list these addresses on fake tax returns so that any checks, payments, and other correspondence will be mailed to the address and thus intercepted by the schemers.

e.   Finally, the schemers usually withdraw the fraudulently-obtained economic stimulus payments through ATM withdrawals from the bank accounts they control, which they listed on the false tax returns.

94.  Based on my training and experience, conversations with other law enforcement officers, and familiarity with investigations into drug trafficking, I know that individuals involved in drug trafficking generally follow recognizable patterns, including the following, among others:

a.    Drug traffickers commit crimes that involve
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers and fraudsters often travel by car, bus, train, or
airplane, both domestically and to foreign countries, in
connection with their illegal activities in order to meet with
co-conspirators, conduct criminal transactions, and transport
drugs or proceeds obtained from fraudulent activity.

b.    Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records related to the
manufacturing, transportation, ordering, sale and distribution
of illegal drugs or proceeds obtained from illegal activity.
The aforementioned records are often maintained where the drug
trafficker has ready access to them, such as in their
residences, businesses, and vehicles, and on their cell phones
and other digital devices.

c.    Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking
and fraud to have photos and videos on their cell phones of
drugs or others working with them, as they frequently send these

photos to each other and others to boast about their illicit
activities.

d.    Drug traffickers, like fraudsters, often keep the
names, addresses, and telephone numbers of their associates on
their digital devices.  Drug traffickers often keep records of
meetings with associates, customers, and suppliers on their
digital devices, including in the form of calendar entries and
location data.

e.    Individuals engaged in the illegal purchase or
sale of drugs and other contraband often use multiple digital
devices, including rotating the usage of telephone numbers to
avoid law enforcement detection.  Narcotics traffickers often
require the use of one or more digital devices to negotiate
times, places, schemes, and manners for importing, possessing,
concealing, manufacturing, and distributing controlled
substances and for arranging the disposition of proceeds from
the sale of controlled substances.

95.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct firearms investigations, I am aware of the
following:

a.    Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residences,
vehicles, and stash houses, or in places that are readily
accessible, and under their physical control, such as in their
digital devices.  It has been my experience that prohibited

individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[17]

96.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[17] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

97.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

98.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress KIM's and FOSTER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of KIM's and FOSTER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

99.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## VIII.    <u>CONCLUSION</u>

100. For all of the reasons described above, there is probable cause that KIM committed a violation of 21 U.S.C. § 841(b)(1)(B)(viii): Possession with Intent to Distribute Methamphetamine.  There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES 1 through 4, as described in Attachments A-1, A-2, A-3, and A-4.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
March, 2021.

THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE