CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JASON HANNAN (290841)
(E Mail:  jason_hannan@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
Facsimile:  (714) 338-4520

*Attorneys for Edward Kim*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. SA CR 21-00041-JVS |
| Plaintiff, | **EDWARD KIM'S POSITION REGARDING SENTENCING;** |
| v. | **EXHIBITS A-E** |
| EDWARD KIM, | **Hearing Date: March 6, 2023** |
| Defendant. | **Time: 9:00 a.m.** |

Edward Kim, by and through his attorney, Deputy Federal Public Defender Jason Hannan, herein submits this sentencing memorandum and exhibits in support of a total sentence of 180 months imprisonment (15 years), to be followed by a five (5) year term of supervised release.  Such a sentence is, under the circumstances, sufficiently punitive, but *not more than necessary*, to effectuate the purposes of sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 17, 2023          By  */s/ Jason Hannan*
_____

JASON HANNAN
Deputy Federal Public Defender

# <u>TABLE OF AUTHORITIES</u>

Page(s)

I.     POSITION ON SENTENCING ..................................................................... 1

II.    OBJECTIONS TO PSR ............................................................................... 4

    A.  Factual Objections to the PSR ........................................................... 4

         1.    Other Conduct Alleged/Pending Charges/Aggravating Factor ......... 4

         2.    Sentencing Disparity ................................................................ 4

    B.  Legal Objections to the PSR ............................................................. 5

         1.    Defendant Should Not Receive a Two-Level Increase Under § 2D1.1(b)(1) Because There is Insufficient Evidence He Possessed a Firearm that was in Connection with the Drug Offense. ...................................................................................... 5

         2.    Mr. Kim Is Not a Career Offender Because His Prior California Conviction under California Penal Code §11379.6 Is Not a Drug Trafficking Offense .................................................................... 7

III.    A 15-YEAR (180 MONTHS) SENTENCE IS SUFFICIENT AND NOT GREATER THAN NECESSARY .................................................................. 9

IV.    APPLICATION OF THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. §3553(A) ........................................................................................ 10

    A.  A Downward Variance Is Warranted Under 3553(A) Because Kim's Criminal Activity Was Driven By An Untreated Methamphetamine Addiction That Can Be Addressed, Corrected And Rehabilitated Both While In Prison And During Supervised Release. ........................................ 11

    B.  Consideration of other Sentencing Factors under 3553(a) also Warrant a Downward Variance to a 180 month (15 Year) Sentence. ........................... 14

         1.    The Proposed Sentence Provides Just Punishment, Protects the Public, and Affords Adequate Deterrence ........................................ 14

         2.    The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment In the Most Effective Manner ........................................ 16

         3.    The Methamphetamine Guidelines are Unduly Harsh:  A Variance Is Warranted Because the Offense Level Over-Relies on the Quantity of a Drug and has no Empirical Basis in Research ................................................................................... 16

V.    CONCLUSION ......................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

CASES

*Cazares-Gutierrez v. Ashcroft*,
    382 F.3d 905 (9th Cir. 2004) ....................................................................9

*Gall v. U.S.*,
    552 U.S. 38 (2007) ...........................................................................9, 16

*Kimbrough v. U.S.*,
    128 S. Ct. 558 (2007) .........................................................................10

*Kimbrough v. U.S.*,
    552 U.S. 85 (2007) .................................................................9, 17, 18

*Koon v. United States*,
    518 U.S. 81 (1996) ................................................................................4

*Lopez v. Gonzales*,
    549 U.S. 47 (2006) ................................................................................9

*Neal v. United States*,
    516 U.S. 284 (1996) ............................................................................17

*Nelson v. U.S.*,
    555 U.S. 350 (2009) ..............................................................................9

*People v. Coria*,
    21 Cal. 4th 868 (Cal. 1999) ................................................................8

*People v. Dunn*,
    2009 WL 3297811 (Cal. Ct. App. 2009) .............................................8

*People v. Glenos*,
    7 Cal. App. 4th 1201 (Cal. Ct. App. 1992) ........................................8

*People v. Sanchez*,
    27 Cal.App.4th 918 (Cal. Ct. App. 1994) ..........................................8

*People v. Stone*,
    75 Cal.App.4th 707 (Cal. Ct App. 1999) ...........................................8

*Rendon v. Mukasey*,
    520 F.3d 967 (9th Cir.2008) ............................................................8, 9

*U.S. v. Booker*,
    543 U.S. 220 (2005) ..............................................................................9

# TABLE OF AUTHORITIES

Page(s)

*U.S. v. Denardi,*
  892 F.2d 269 (3d Cir.1989) ..........................................................................10

*U.S. v. Reyes-Mendoza,*
  665 F.3d 165 (5th Cir.2011) ...........................................................................9

*U.S. v. Whitehead,*
  532 F.3d 991 (9th Cir.2008) ...........................................................................9

*United States v. Are,*
  590 F.3d 499 (7th Cir. 2009) ..........................................................................7

*United States v. Barsumyan,*
  517 F.3d 1154 (9th Cir. 2008) ......................................................................18

*United States v. Boshell,*
  952 F.2d 1101 (9th Cir. 1991) .........................................................................5

*United States v. Carvajal,*
  2005 WL 476125 (S.D.N.Y. Feb 22, 2005) ....................................................3

*United States v. Cazares,*
  121 F.3d 1241 (1997) .......................................................................................6

*United States v. Diaz,*
  No. 11-CR-00821-2 JG, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) ...........17

*United States v. Garcia-Guerrero,*
  635 F. 3d (9th Cir. 2011) .................................................................................5

*United States v. Goodman,*
  556 F.Supp.2d 1002 (D. Neb. 2008) .............................................................18

*United States v. Hartle,*
  Case No. 4:16-CV-00233-BLW, 2017 WL 2608221 (D. Idaho June 15,
  2017) ...............................................................................................................17

*United States v. Juan,*
  59 F.Supp. 2d 210 (D. Mass. 1999) .................................................................6

*United States v. Marcial-Santiago,*
  447 F.3d 715 (9th Cir. 2006) ...........................................................................4

*United States v. Mitchell,*
  624 F.3d 1023 (9th Cir. 2010) .......................................................................16

# <u>TABLE OF AUTHORITIES</u>

Page(s)

*United States v. Valle*,
    940 F.3d 473 (9th Cir. 2019) ...................................................................7

**Statutes**

18 U.S.C. § 3553 ..........................................................................................*passim*

18 U.S.C. §3582 ...............................................................................................16

28 U.S.C. §991 ...................................................................................................5

U.S.S.G. § 2D1.1 ............................................................................................5, 7

# I.

## POSITION ON SENTENCING

Edward Kim has hit absolute, rock bottom and it is, tragically, a dark illustration of how addiction to methamphetamine, in particular, can absolutely destroy anyone on its path. Other than his addiction to methamphetamine, Edward Kim and his life would have been, in all likelihood, on the same good path as his parents, his sister, and other members of his immediate family.

Kim's parents immigrated from Korea and, in admirable fashion, they came to the United States and worked hard from the beginning under difficult circumstances. They supported themselves and their young family by establishing a series of successful, small businesses from New York to Connecticut to Colorado - and to California, where they have resided since.

This hard work provided both Edward Kim and his older sister with economic stability and educational opportunities while growing up. And there are no reports of any overt abuse or violence within his family. Indeed, his family's letters to this Court evidence a mature understanding of how important family is -- and what true love and support means. *See* Exhibits B-D (attached).

Kim's parents modeled a work ethic that even Kim himself fully adopted when he grew up and was still in his 20s. From 2007 to 2012, Kim became successful in a field of endeavor that he loved: music. After his parents moved to California, Kim attended William Morris Music School and completed a year-long education/training program. *See* PSR, ¶144, p. 28. During his training period, Kim simultaneously began an internship with Artisan Music Group (AMG) in Culver City, California, which thereafter resulted in full-time employment. *See* PSR, ¶145-146, pp. 28-29. Kim was working hard as a music studio manager, ultimately producing his *own* music for AMG for wider broadcast.

1

But, it was during this same time period that methamphetamine use had also begun to do its work, too -- and, tragically, it would change the entire direction of Kim's life.  In 2013, Kim left his employment at AMG and began to use methamphetamine to the point of law enforcement contact with California state authorities.  And it simply got worse from there.  By 2019-2020, during the time period of the offenses in this case, Kim's addiction to methamphetamine had taken absolute control over his life, his personality, and his actions.  Since March of 2020, based on his arrest for the instant offenses, Kim has been imprisoned at MDC-LA:

> Now that I am completely sober, I've taken it upon myself to use this time to reflect on everything that's led up to this point and I've tried to realize the times where I faced life changing points in my life and made some bad decisions. For example when I was working in the music industry I was surrounded by driven and business minded individuals who were focused on the betterment of themselves, the people around them and society as a whole. If I had continued to take advantage of the opportunities that were provided to me at this time in my life instead of venturing off into drug use and negative associations which slowly became a lifestyle, my life would be much better and more socially acceptable today.

*See* Exh. A, Letter of Edward Kim.

Kim will come before this Court for sentencing and he simply asks this Court to give him at least some measure of mercy: that is, only to give him a chance that is at least somewhat *sooner than* that the sentence that is called for by calculation of the federal, advisory sentencing guidelines.

In their letters to this Court, Mr. Kim and his family members are asking this Court to give him a chance to show that who he really is when he is not addicted to methamphetamine.  Kim can address his methamphetamine addiction, complete treatment and succeed while on supervision of this Court.  That supervision, which is a

2

a minimum of five years, and will include frequent drug testing, will serve to protect the public -- if he were to fail at any point in the future.

In its report and recommendation, the probation department briefly states that "[i]n mitigation, Edward Kim has suffered from a 15-year drug dependency, for which he has not received any meaningful treatment." *See* Dckt. #42, p. 8. This is the central truth in this case, and some mercy may be shown. Given an opportunity, Kim can show that he can be rehabilitated sooner than the sentence called for by the advice of the federally-formulated sentence guidelines.

Indeed, the sentencing goal of rehabilitation "cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of humankind . . . A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life." *United States v. Carvajal*, 2005 WL 476125 (S.D.N.Y. Feb 22, 2005)(sentencing a career offender 168 months instead of the 262 career offender guidelines).

The defense respectfully requests and suggests that a sentence of 15 years (180 months) imprisonment is sufficient, as it is still 5 years above the statutory mandatory minimum applicable in this case. It is an extremely lengthy sentence - and a profoundly severe punishment - that accounts for the seriousness of his criminal conduct, but that also reflects that Kim's crimes were the product of a methamphetamine addiction that spiraled out of control. Even a sentence of 15 years would require Mr. Kim to remain in prison until he is nearly 50 years old. Kim's parents are elderly, and he has every incentive to address his addiction and to support them, as well as the life of his young son before he reaches adulthood.

3

## II.

## OBJECTIONS TO PSR

The defense submits the following factual and legal objections.

### A.  Factual Objections to the PSR

### 1.      Other Conduct Alleged/Pending Charges/Aggravating Factor

The PSR lists other *alleged,* criminal conduct which was either dismissed or wherein there are pending state charges. *See* PSR, ¶¶115-119, p. 23-24.  First, it cannot be presumed that the state has a sufficient basis for the charges or that it will actually pursue any of the alleged charges therein listed in the PSR as pending matters. Secondly, given that these are allegations only - and the allegations were either dismissed and/or are pending legal matters - the defense submits herein its objection to any all of the factual allegations contained therein.  Finally, given that these paragraphs constitute only allegations of other criminal conduct, defendant similarly objects to the probation officer using them as an *aggravating* factor in the probation office's recommended sentence. *See* PSR's Recommendation, Dckt #42, pp. 7-8.

### 2.      Sentencing Disparity

Other than to state that there were several co-conspirators located in Hawaii to whom Mr. Kim mailed packages of methamphetamine, there is no additional information as to the charges and the sentence those co-conspirators received for the same and/or similar conduct. *See* PSR, ¶17-20, p. 7; ¶72, p. 15.

18 U.S.C. §3553(a)(6) provides that the district court, in determining the sentence to be imposed, should avoid sentencing disparities among similar defendants found guilty of similar conduct.  *United States v. Marcial-Santiago*, 447 F.3d 715, 719 (9th Cir. 2006).  "The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Although the Sentencing Guidelines are not mandatory and are merely advisory, avoidance of sentencing disparity remains an important and

4

"central goal" of the Guidelines.  28 U.S.C. §991(b)(1)(B); U.S.S.G. Ch. 1., Pt. A, p.s. 3 ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders"); see also *United States v. Garcia-Guerrero*, 635 F. 3d at 438 (9th Cir. 2011); *United States v. Boshell*, 952 F.2d 1101 (9th Cir. 1991).

In order for this Court to take into account and minimize sentencing disparity among similarly-situated defendants, it would be required to be informed what sentence other defendants'/co-conspirators in the same circumstances as defendant received for the same/similar conduct.  Here, there is no such information; accordingly, defendant objects to the lack of information in the pre-sentence report in this regard.

**B.    Legal Objections to the PSR**

Regarding the Offense Level, the defense objects to the PSR's calculation that the total offense level is 38.  For the reasons below, the defense submits that the adjusted offense level should be 36, and that, therefore, the Total Offense Level should be 33, following a 3-level reduction for acceptance of responsibility.  At criminal history category VI, Level 33 would correspond to an advisory guideline sentencing range of 235-293 months.

**1.    Defendant Should Not Receive a Two-Level Increase Under § 2D1.1(b)(1) Because There is Insufficient Evidence He Possessed a Firearm that was in Connection with the Drug Offense.**

The controlling guideline is U.S.S.G. § 2D1.1(b)(1), which would apply a two-level increase in offense level "[i]f a dangerous weapon (including a firearm) was possessed."  The PSR ¶47, p. 11 states that a Glock P-80 loaded with 6 .40mm caliber bullets was located at a La Habra warehouse during the execution of a search warrant. The PSR perfunctorily alleges that it was in close proximity to controlled substances and recommends a two-level increase.  *Id.* ¶67, p. 14.

The plea agreement of the parties also reflects that at defendant's DTLA apartment "agents found two polymer P80 jigs, an empty slide box, and an empty

5

package for a Glock-style tactical slide stop in a safe within defendant's apartment." This refers to portions of materials and molds only that could allegedly be used, along with other materials, as a kit in a step to build a firearm.  The plea agreement further reflects that " a Glock P80 lookalike gun, bearing no serial number (commonly referred to as a "ghost gun") was later found in a toolbox at the La Habra Warehouse in April 2021." *See* CR 21-00041-JVS, Plea Agreement at Dock. #36, p. 19.

For the two-level increase of possessing a firearm to apply, the government has the burden to prove possession in connection with the offense by a preponderance of the evidence.  *United States v. Cazares*, 121 F.3d 1241, 1244 (1997) (citing *United States v. Mergerson*, 4 F.3d 337, 550 (5th Cir. 1993)).  In a case of constructive possession, the government "must prove a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the [contraband.]"  *Cazares*, 121 F.3d at 1245 (quoting *United States v. Keiso*, 942 F.2d 680, 682 (9th Cir. 1991)) (internal quotation marks omitted).

In *United States v. Cazares*, 121 F.3d 1241 (1997), the Ninth Circuit found that the district court's application of a two-level increase was clearly erroneous.  In that case the police searched a shared residence shortly after the defendant's arrest, and in one of the bedrooms they found two loaded handguns and a rifle.  *Id.* at 1244. Although the defendant lived in the residence, so did a number of other individuals who were not charged as members of the conspiracy.  The government did not offer evidence "to support a finding that Parra Cazares knew of the guns' existence or was in any way connected with them, by ownership, fingerprints, or otherwise."  *Id.* at 1245. As a result, the court concluded that the defendant did not possess the firearms, and that the two-level increase should not apply.

Federal courts have stated that "[m]ere presence of a gun is obviously not sufficient." *United States v. Juan*, 59 F.Supp. 2d 210, 216 (D. Mass. 1999). Instead, there must be a "relationship between the weapon and drug offense." *United States v. Are*, 590 F.3d 499, 526 (7th Cir. 2009). *See also* U.S.S.G. § 2D1.1 cmt n. 11(A) ("The

1  enhancement for weapon possession in subsection (b)(1) reflects the increased danger

2  of violence when drug traffickers possess weapons.") Again, the government bears the

3  burden to show, by a preponderance of the evidence, that this enhancement applies to

4  Mr. Kim's conduct. *See United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019).

5        Here, no enhancement should apply based on the possession of a dangerous

6  weapon because there was no connection or relationship established between the instant

7  offense of shipping methamphetamine to Hawaii, and the firearm -- just an alleged

8  'close proximity' that is apparently physical in nature.  It is not apparent that defendant

9  or any co-conspirator used it to facilitate, further or assist in any way in the conspiracy

10 to mail packages of methamphetamine to the state of Hawaii.  Accordingly, the defense

11 objects to application of the two-level enhancement for possession of a dangerous

12 because there is insufficient evidence that the firearms was possessed in connection

13 with the offense.

14 **2.    Mr. Kim Is Not a Career Offender Because His Prior California**

15 **Conviction under California Penal Code §11379.6 Is Not a Drug**

16 **Trafficking Offense.**

17       At ¶104, p. 20, the PSR concludes that Mr. Kim is a career offender, in part,

18 because he had a prior conviction under California Penal Code §11379.6.  Section

19 11379.6 provides, in relevant part, as follows:

20              Except as otherwise provided by law, every person who

21              manufactures, compounds, converts, produces, derives,

22              processes or prepares, either directly or indirectly by chemical

23              extraction or independently by means of chemical synthesis,

24              any controlled substance specified in Section 11054, 11055,

25              11056, 11057, or 11058 shall be punished by imprisonment ...

26 Cal. Health & Safety Code § 11379.6(a).  The cross-referenced provisions –

27 California Health & Safety Code §§ 11054, 11055, 11056, 11057, and 11058 –

28 correspond to California Drug Schedules I, II, III, IV, and V, respectively.  The

Supreme Court of California has held that § 11379.6 covers the manufacture of drugs for personal use without any kind of commercial dealing.  See People v. Coria, 21 Cal. 4th 868, 878 (Cal. 1999) ("section 11379.6 . . . forbid[s] the manufacture of controlled substances for mere personal use or consumption, as well as for sale or distribution to the public.").

In addition to criminalizing the completed production of a controlled substance, without a trafficking element, § 11379.6 also criminalizes "the initial and intermediate steps carried out to process a controlled substance." *Coria*, 21 Cal.4th at 874; *see also People v. Stone*, 75 Cal.App.4th 707, 715 (Cal. Ct App. 1999) ("Each and every stage of the process for manufacturing PCP–from inception through completion–is embraced by the proscription against the manufacture of PCP.").

Appellate-level courts in California have recognized this as well.  *See, e.g., People v. Dunn*, 2009 WL 3297811, *3 (Cal. Ct. App. 2009) (unpublished) (finding evidence was sufficient for jury to conclude that the "defendant was either in the middle of, or had recently finished, manufacturing a small quantity of methamphetamine for personal use."); *People v. Sanchez*, 27 Cal.App.4th 918, 923 (Cal. Ct. App. 1994) (unlike California Health & Safety Code § 11366.5, which contains the element that a controlled substance is manufactured "for the purpose of sale or distribution to others," § 11379.6 lacks such an element); *People v. Glenos*, 7 Cal. App. 4th 1201, 1209 (Cal. Ct. App. 1992) ("Thus, aiding and abetting the manufacture of a controlled substance for personal use would violate section 11379.6, subdivision (a) . . . .").

Because the California state court has made clear that § 11379.6 does not require "commercial dealing," Mr. Kim's  conviction is not categorically an illicit drug trafficking felony.  *Rendon v. Mukasey*, 520 F.3d 967, 975 (9th Cir.2008).  Similarly, under *Lopez v. Gonzales*, 549 U.S. 47, 53 (2006), "'trafficking' means some sort of commercial dealing." *See Rendon*, 520 F.3d at 975.  Given this definition, when a state statute sweeps in drug-related activity that does not involve commercial dealing, it

8

lacks a trafficking element and cannot be an illicit trafficking felony. *See, e.g., Cazares-Gutierrez v. Ashcroft*, 382 F.3d 905, 918 (9th Cir. 2004) (holding that state conviction for possession of methamphetamine is not an illicit trafficking aggravated felony, in part, because possession contains no trafficking element). *See also*, *U.S. v. Reyes-Mendoza*, 665 F.3d 165, 169 (5th Cir.2011)(analyzing California courts' construction of the term, "manufacture", in reviewing whether defendant's prior conviction under CA Section 11379.6 was categorically a drug trafficking offense, but under the illegal reentry sentencing guidelines).

## III.

## A 15-YEAR (180 MONTHS) SENTENCE IS
## <u>SUFFICIENT AND NOT GREATER THAN NECESSARY</u>

The importance of the factors set forth in 18 U.S.C. §3553, the core principles of sentencing, and how they relate to one another in light of the advisory guidelines, were squarely addressed by the Supreme Court in *U.S. v. Booker*, 543 U.S. 220 (2005), *Gall v. U.S.*, 552 U.S. 38 (2007), and *Kimbrough v. U.S.*, 552 U.S. 85 (2007). "The guidelines are not only <u>not</u> mandatory on sentencing courts; they are also <u>not</u> to be presumed reasonable." *Nelson v. U.S.*, 555 U.S. 350, 352 (2009)(underline emphasis added). Sentencing factors that would justify a sentence that happens to be outside the guideline are no longer required to be considered "extraordinary." *Gall*, 552 U.S. at 47. "One theme" runs through the Supreme Court's important sentencing decisions: "*Booker* empowered district courts, not appellate courts . . . [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing...." *U.S. v. Whitehead*, 532 F.3d 991, 993 (9th Cir.2008).

Additionally, the statute that governs this Court's sentencing decision, 18 U.S.C. § 3553(a), requires the imposition of an individualized sentence that is "<u>sufficient, but no greater than necessary</u>," to achieve the purposes of the Sentencing Reform Act. This statutory language distills one of the most long-established maxims of criminology,

"the principle of parsimony."  That principle provides that punishment should <u>never</u> exceed the minimum necessary to effect the purposes of punishment.

The statute's charge that a defendant's sentence be "no greater than necessary" is the "overarching provision" in § 3553(a).  *Kimbrough v. U.S.*, 128 S. Ct. 558, 570 (2007).  The "parsimony principle" is not mere precatory language, but is a key – in fact, the key – legal requirement that a sentence must satisfy.  Where the advisory guidelines conflict with other sentencing factors set forth in § 3553(a), these statutory sentencing factors should generally trump the advisory sentencing guidelines.  *See U.S. v. Denardi*, 892 F.2d 269, 276-77 (3d Cir.1989)(Becker, J., concurring in part, dissenting in part) (arguing that the imposition of a sentence greater than necessary to meet the goals of sentencing violates the statute even if it is within guideline range).

## IV.

## APPLICATION OF THE SENTENCING FACTORS
## SET FORTH IN 18 U.S.C. §3553(A)

In deciding the sentence to impose, this Court considers all of the statutory sentencing factors set forth in 18 U.S.C. §3553(a), including, among other factors, the nature and circumstances of the offense; the history and characteristics of the offender; the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence; the applicable sentencing range under the advisory sentencing guidelines; and the need to avoid unwarranted sentencing disparity.  18 U.S.C. §3553.

Mr. Kim respectfully submits that a sentence of 15 years (180 months) imprisonment is sufficient, but not greater than necessary, to accomplish those purposes in light of his unique personal circumstances.

**A.     A Downward Variance Is Warranted Under 3553(A) Because Kim's Criminal Activity Was Driven By An Untreated Methamphetamine Addiction That Can Be Addressed, Corrected And Rehabilitated Both While In Prison And During Supervised Release.**

The presentence report focuses heavily on the nature and circumstances of the offense and the need for punishment, while in passing - in one sentence - acknowledges that "[i]n mitigation, Kim appears to have suffered from a 15-year drug dependency, for which he has not received any meaningful treatment." Dckt #42, p. 8.  This methamphetamine addiction, however, is the central factor in this case and exactly something that can be addressed during imprisonment and during a lengthy period of supervision.  Moreover, Mr. Kim's personal and family history and circumstances - and obvious family support and presence - is apparent from the letters submitted to the Court.  These are precisely the circumstances under which a Court can remain hopeful that Kim can return to a life of sobriety for himself, his family, and his son.

Kim's Personal Background and Family History/Characteristics

Edward Kim is 37 years old, and was born in New York to the union of Yon Jay Kim, now age 67, and Mindy Kim, now age 63. *See* PSR, ¶132, p. 27.

Kim's father suffers from diabetes, and Kim's mother has been hospitalized on numerous occasions.  She has heart problems and was previously diagnosed with throat cancer, though thankfully it is currently in remission. *See* PSR, ¶134, p. 27.  Kim's parents are currently the primary caretakers of defendant Edward Kim's son, Cairo, age 4, who lives with them. *See* PSR, ¶136, p. 27.

Kim's parents wrote a letter to this Court, which can be reviewed at Exh. B (attached).  With regard to their grandson, Cairo, Mr. Kim's parents point out the relationship that still exists between Cairo and his dad:

> Edward has a wonderful four year old son named Cairo with the most beautiful eyes.  We are the sole caregivers of him currently.  However, we are seniors with many health issues including diabetes, high cholesterol and heart disease among others.  We do not believe we

11

can continually care well for Cairo and hope that Edward will be able to raise his son.  Cairo still asks us where his dad is and we hope they can be united sooner rather than later as they miss each other very much.

We ask that you give Edward a chance to correct his mistakes and live a rewarding life with his son and family out in society.

*See* Exh. B (attached).

Mr. Kim's parents are genuinely and legitimately concerned about their ability to raise Cairo over the long term, as they are already in their 60s, with health problems. Thus, Edward Kim has a beautiful -- and natural incentive -- to address his methamphetamine addiction and to rehabilitate, as soon as possible.  Kim has rightfully been incapacitated by imprisonment and has sobered up to the reality of what he needs to do.  He is committed to doing everything in his power to further his sobriety and rehabilitation for the future, and he will likewise put in the work necessary to become a better man for society, his family, himself -- and his young son.

In his letter to this Court, Kim states as follows:

> Because of my drug use, I've lost everything that mattered to me, most importantly, the custody of my 4 year old son. The mother of my son also struggles with drug addiction and has also lost custody and is unable to care for or support him. Thankfully, my parents were there to adopt him but both my mother and father have had recent health issues as they're getting older. They both suffer from diabetes, and my mother has been battling throat cancer for the past 5 years, which has gone into remission for now. My greatest fear in the situation that I'm in right now is that my parents pass away while I am incarcerated, not only because I desperately want to redeem myself to them in their lifetime, but also because of what would happen to my son.

*See* Exh. A (attached).

12

Kim has one sibling, a sister named Olivia, who is also supportive.  She is 31 years old, and lives in Irvine.  *See* PSR, ¶135, p. 27.  She echoes the sentiment that there is, indeed, family support that is present, stating as follows:

> I ask that although he is rightfully punished for his mistakes, to please give him a second chance to correct his life, learn from his regrets, and not to miss  the chance to live a fulfilling life, with not only his sister but his parents, uncles, aunts, cousins and nieces who are all waiting for him, but also his beautiful four year old son, Cairo.  I wish Edward will be able to experience the absolute delightfulness Cairo is and be able to be a part of his life, as a father and son should grow and love together.

See Exh. C (attached); *see also* Exh. D-E (additional letters to the Court, evidencing other family/community support as well).

In sum, Edward Kim, his parents -- and his sister -- have written letters to the Court pleading with your Honor to punish him, certainly, but also to give him the chance to make himself right sooner rather than simply imposing the unduly harsh sentence called for in the advisory guidelines.  They have also committed to surround him with the love and support of family as he takes on this endeavor:

> [Edward Kim] has family here waiting for him, to help him as he finds his journey back to living a fulfilling and meaningful life surrounded by love. Please take this into consideration during your judgment of Edward's situation.

See Exh. B.

In this particular case, a 15 year sentence *IS* harsh, and it still achieves the goals of sentencing. Our society is better served by being hopeful in the real possibility that Kim can learn to be sober again and reunite and support his son and elderly parents, rather than confining him to a federal prison for an even longer, unnecessary period of

13

time that in all likelihood appears ineffective and inconsequential to what will happen after he is released.  A 15 year sentence is a certain and significant punishment -- and it is enough.  Moreover, given the extended, five-year term of supervised release to be imposed -- the Court will still retain significant supervision over him for a lengthy period of time, which is there to determine if he has, indeed, reintegrated into society or has fallen back into the use of methamphetamine.

**B.      Consideration of other Sentencing Factors under 3553(a) also Warrant a Downward Variance to a 180 month (15 Year) Sentence.**

      **1.      The Proposed Sentence Provides Just Punishment, Protects the Public, and Affords Adequate Deterrence**

The defense's proposed sentence is sufficient to afford a lasting and just punishment.  Fifteen (15) years in prison is a life-altering reality by any measure.  Due to his own conduct, Kim will already miss out on the life of his son, Cairo.  But at some reasonable point in his son's life, it seems merciful and right to simply give Kim an opportunity to be able to be a father again and to show himself able to address his drug addiction and become a part of his son's life, before his young son becomes an adult. With a 180 month sentence, Mr. Kim's son is already nearing adulthood upon release.

Moreover, a sentence of 15 years federal imprisonment is somewhere in the neighborhood of 10 to 15 times longer than any prior term that he served in a California jail for involvement in methamphetamine. *See* PSR ¶¶104, 108, 111 (showing 1-3 year stints in jail term, which do not take into account the good time and early releases credits via that regularly occur in the state of California's criminal system).

As for deterrence and public protection, the question the law asks is not whether a sentence of longer than 180 months would promote those goals, but what is the minimum term *necessary* to comply with those goals.  *See* 18 U.S.C. § 3553(a).  There is no evidence that a lengthier sentence have deterrent value for a methamphetamine-addicted individual like Edward Kim.  What will ultimately protect the public and avoid any future recidivism is substance abuse treatment and rehabilitation.

14

Indeed, deterrence via the suggested sentence called for in the advisory guidelines here, is beyond what is necessary. The empirical evidence is unanimous that there is <u>no</u> general relationship between sentence length and general or specific deterrence, in any event, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence between probation and imprisonment for white collar offenders); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Even the Sentencing Commission itself has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004). And according to "the best available evidence . . . prisons do not reduce recidivism

15

more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

### 2. The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment In the Most Effective Manner

In determining a defendant's need for "correctional treatment in the most effective manner," *see* 18 U.S.C. §3553(a)(2)(D), the Court must focus on the fact that "imprisonment is not an appropriate means of promoting correction and rehabilitation," *see* 18 U.S.C. §3582(a), and that a sentence should be "sufficient, but not greater than necessary," *see* 18 U.S.C. §3553(a).

Mr. Kim seeks treatment and seeks to make sobriety a long-term reality, and, to that end, asks the Court for a RDAP recommendation.

Mr. Kim hopes to be admitted into, and complete, the RDAP program while in custody and he will enroll in any other opportunities for substance abuse and health treatment while in custody. He is seeking drug abuse treatment while incarcerated and requests that this Court formally recommend placement in the BOP's Residential Drug Abuse Program (RDAP) during his term of custody. RDAP provides intensive cognitive-behavioral, residential drug abuse treatment, and it consists of a minimum of 500 hours of treatment programming delivered over the course of a 9 to 12 month period. Given his long-standing drug addiction and his desire to seek treatment, Mr. Kim is likely to and hopefully will benefit from such treatment.

### 3. The Methamphetamine Guidelines are Unduly Harsh:  A Variance Is Warranted Because the Offense Level Over-Relies on the Quantity of a Drug and has no Empirical Basis in Research

Mr. Kim's base offense level of 34 and accompanying guidelines range should not be presumed reasonable. *See United States v. Gall*, 552 U.S. 38, 50 (2007) (holding that a sentencing court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented"). "Sentencing

16

judges can reject *any* Sentencing Guideline, provided that the sentence imposed is reasonable." *United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010) (affirming 43-month departure from low end of career-offender guideline based on "policy disagreement with the crack/powder sentencing disparity").

A variance downwards to a 180 month sentence still meets the goals of section 3553(a) provided it is in accord with the directive of parsimony. *Kimbrough v. United States*, 552 U.S. 85, 11 (2007).

Unfortunately, the United States Sentencing Commission (the "Commission") adopted the ADAA's scheme of sentencing based on drug type and amount. The Commission typically "developed Guidelines sentences using an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports." *Kimbrough*, 552 U.S. at 96 (citing U.S.S.G. § 1A.1, intro. cmt., pt. A, ¶ 3). However, "[t]he Commission did *not* use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses." *Id.* (emphasis added); *see also United States v. Diaz*, No. 11-CR-00821-2 JG, 2013 WL 322243, at *4 (E.D.N.Y. Jan. 28, 2013) (explaining that "empirical data on drug trafficking offenses were gathered, but they had *no* role in the formulation of the Guidelines ranges for drug trafficking offenses"). Instead, "[p]erhaps bowing to political pressure . . . the Commission simply keyed the Guidelines range to the statutory mandatory minimum sentences Congress established for drug crimes." *Ibarra-Sandoval*, 265 F.Supp.3d at 1253. The Commission did so by linking the guidelines range at levels 26 and 32 to the mandatory minimum quantities. *See Diaz*, 2013 WL 322243, at *6; *see also Neal v. United States*, 516 U.S. 284, 291-92 (1996).

It is also problematic that the drug guidelines are simply driven by the statutory mandatory minimums, which are the "product of political calculation and compromise rather than empirical analysis." *United States v. Hartle*, Case No. 4:16-CV-00233-BLW, 2017 WL 2608221, at *2 (D. Idaho June 15, 2017). Because the drug guidelines "do not exemplify the Commission's exercise of its characteristic institutional role"

17

which is to "base its determinations on empirical data and national experience," *Kimbrough*, 552 U.S. at 109 (citations omitted), there is a strong justification to vary from the guidelines based on policy disagreements.  *See also United States v. Goodman*, 556 F.Supp.2d 1002, 1010 (D. Neb. 2008) (The Commission set offense levels for drug offenses based on statutory mandatory minimums, and "[c]onsequently the Guideline ranges of imprisonment for those crimes are a less reliable appraisal of a fair sentence.").

Notably, other crimes that also carry a base offense level of up to 38 include second degree murder (§ 2A1.2), aggravated sexual abuse of a child by force or threat of force (§ 2A3.1), pirating an aircraft (§ 2A5.1), and selling or buying children for use in the production of pornography (§ 2G2.3).

For the reasons outlined above, the preliminary, base offense level of 34 should not be presumed reasonable.  When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve the purposes of section 3553(a).  *Kimbrough*, 552 U.S. at 109; *see also United States v. Barsumyan*, 517 F.3d 1154 (9th Cir. 2008).

Accordingly, Mr. Kim respectfully asks the Court to consider varying downward to a 15 year term of imprisonment.

///

///

///

18

## V.

## CONCLUSION

Edward Kim respectfully requests that this Court impose a total sentence of 180 months (15 years) imprisonment, to be followed by a five-year period of supervised release, which is sufficient and not more than necessary to achieve the goals of sentencing in this case.  Kim requests a recommendation for placement in the BOP's Residential Drug Abuse Program (RDAP) during his term of custody.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 17, 2023        By   */s/ Jason Hannan*
JASON HANNAN
Deputy Federal Public Defender

# **PROOF OF SERVICE**

I, Maurine Von Winckelmann, declare that I am a resident or employed in Orange County, California; that my business address is the Office of the Federal Public Defender, 411 West Fourth Street, Suite 7110, Santa Ana, California  92701-4598, Telephone No. (714) 338-4500; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **EDWARD KIM'S POSITION REGARDING SENTENCING;  EXHIBITS A-E**  on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [x ] By E-mail addressed as follows: |
|---|---|---|---|

Bryant Coffman
United States Probation
Santa Ana, California

Bryant_Coffman@cacp.uscourts.gov

This proof of service is executed at Santa Ana, California, on February 17, 2023. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Maurine Von Winckelmann*

20